# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**FILED**

AUG 3 0 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | |
|---|---|
| *JERRY WANZER, TDCJ # 855976* | § |
| **Plaintiff,** | § |
| | § |
| *v.* | §    **Civil Action No. SA-02-CA-0246-XR** |
| | § |
| *KIM THU THI CHU, ET AL.,* | § |
| **Defendants.** | § |

## DEFENDANTS MERCADO, FELKINS, BLACK,
## R. McKINNEY, MENDOZA, PARKER, AND GREEN'S
## MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COME NOW Defendants Stephen Mercado, M.D., Verlis Felkins, P.A., Tonia Black, Rochelle McKinney, R.N., Oscar Mendoza, Robert Parker, and Steven Green, by their counsel of record, the Attorney General of Texas, and file this their Motion for Summary Judgment With Brief in Support. In support thereof, these Defendants respectfully state the following:

### I.
### NATURE OF CASE

Plaintiff, an inmate of the Connally Unit of the Texas Department of Criminal Justice (TDCJ), filed this civil rights lawsuit under 42 U.S.C. § 1983 *pro se* and *in forma pauperis* on February 28, 2002.[1] Plaintiff, who now has appointed counsel, sued 14 individuals employed by either TDCJ or the University of Texas Medical Branch at Galveston (UTMB), claiming deliberate indifference to medical needs, in violation of the Eighth Amendment. The Court has granted summary judgment for four individuals (Chu, K. McKinney, Nusynowitz, and Uhbrock) and Plaintiff

---

[1]Under federal law, the date of filing for prison inmates is the date that the pleading is placed in the prison's mailing system. *Houston v. Lack,* 487 U.S. 266 (1988). Plaintiff executed his document on February 28, 2002 and presumably mailed it at least that early.

\\22-

has failed to serve three individuals who have not made an appearance ("John Doe," Maria Payon, and Gerald Myers). This motion is being filed on behalf of the remaining defendants who have filed an answer. These defendants asserted qualified immunity in their answers.

Plaintiff claims in his lawsuit that doctors and correctional officials at the Connally Unit were deliberately indifferent and did not provide appropriate medical care for a claimed thyroid condition. Plaintiff alleges that defendants Captain Gerald Myers and Manager Tonia Black of the Connally Unit's Food Service Department refused to provide him "a 5,000 high calorie double portion hypercaloric diet issued by the medical doctors to meet Plaintiff's health needs to control weight loss." He claims that when he sent requests to the kitchen on July 12, 1999, January 4, 2000, January 14, 2000 and October 30, 2000, he never received a response. He claims he also complained to Connally Unit's Medical Department by sending requests on October 20, 2001 and December 5, 2001. According to Plaintiff, when this proved ineffective, he filed grievances. Finally, Plaintiff contends that Myers and Black have been deliberately indifferent to his medical needs by refusing to comply with medical doctors' instructions regarding Plaintiff's medically prescribed diet.

## II.
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56©), these Defendants move this Court to grant summary judgment in their favor on all claims. In support of this motion, these Defendants rely upon the Undisputed Material Facts below and the following exhibits contained in the attached Appendix:

> **Exhibit A**     **Affidavit of Kuchukulla Ashok Reddy, M.S., R.D., L.D.**
> **With Attachments 1, 2, 3, and 4**
>
> **Exhibit B**     **Affidavit of Captain Vincent Francis**

With Attachments 5[2]

| | |
|---|---|
| **Exhibit C** | **Affidavit of Tonia Black** |
| **Exhibit D** | **Affidavit of Dan Kelley, M.D.[3]**<br>**With Attachment 7** |
| **Exhibit E** | **TDCJ Unit Medical Records for Jerry Wanzer, #855976,**<br>**from 1/25/99 to 5/15/03** |
| **Exhibit F** | **Affidavit of Martin L. Nusynowitz, MD. (First Affidavit)** |
| **Exhibit G** | **Affidavit of Kevin H. McKinney, MD., FACE,FACP** |
| **Exhibit H** | **Affidavit of Martin L. Nusynowitz, MD. (Second Affidavit)** |
| **Exhibit I** | **UTMB Medical Records for Jerry Wanzer, #855976,**<br>**for time period ending May 22, 2003** |
| **Exhibit J** | **Selected TDCJ Grievances Filed by Plaintiff** |

## III.
## UNDISPUTED MATERIAL FACTS

*Facts Regarding Plaintiff's Claim of Denial of Prescribed 5,000 Calorie Diet Tray*

1.      In 1994, TDCJ and UTMB entered into a contractual relationship whereby UTMB would provide medical and other services to inmates incarcerated in TDCJ prisons.  The entity created by the contract is called, UTMB/TDCJ Correctional Managed Care ("CMC").  **Exhibit A.**

2.      Mr. Kuchukulla Ashok Reddy is employed as Chief Dietician for CMC, a position that he has held since 1994.  As part of his responsibilities, he helped write the TDCJ/UTMB Therapeutic (Medical) Diets Policy I-1.1, which is applicable to the prisons.   The policy was originally

---

[2]Attachment 6 is identical to Attachment 1 and therefore, the undersigned has removed it so as to prevent unnecessary duplication of documents.

[3]A facsimile copy of Dr. Kelley's affidavit is being provided.   The undersigned will supplement with the originally signed affidavit promptly upon receipt.

formulated in 1995 and has been revised since them.  Mr. Reddy is familiar with each of the revisions.   Copies of the policy effective November 1, 1999 to the current are attached as Attachments 1-4 to Exhibit A.   **Exhibit A.**

3.      As Chief Dietician, Mr. Reddy's responsibilities have included ensuring that inmates are provided with appropriate diets. TDCJ provides both regular (non-therapeutic) and therapeutic (medical) diets as prescribed by the doctors in the prison unit medical facilities.  The therapeutic diets must meet the requirements of CMC's Therapeutic (Medical) Diets Policy I-1.1.  Mr. Reddy is responsible for the development of this policy.  **Exhibit A.**

4.      Each year since 1995, Mr. Reddy has created 12-month therapeutic and non-therapeutic diet menu plans for inmates.  These menus are distributed to each prison Unit Food Service Department, which is then responsible for preparing and serving the meals as created by Mr. Reddy.  In addition, any inmate may choose, at anytime, to receive a pork-free or meat-free diet, which does not require an order or prescription from any health care provider.  **Exhibit A.**

5.      CMC provides, and has provided since 1995, the following therapeutic diets to meet the medical needs of the inmates:  Diet for Health, Hypercaloric Diet, Dental Diet, Clear Liquid Diet, Protein Restricted Diet, Renal Diet, and other therapeutic diets, such as Gluten-Free, that may be ordered if required.  For these other therapeutic diets, the qualified healthcare provider is required to notify the Chief Dietician to assist in formation of the diet plans.  **Exhibit A and Attachments 1-4; Exhibit B.**

6.      Mr. Reddy prepares, and has prepared since 1995, 12-month menus for the Diet for Health and the Hypercaloric Diet.  The other therapeutic diet menus are created on a patient by patient basis. Only authorized medical personnel are authorized to order a therapeutic diet for an inmate.

**Exhibit A; Exhibit C.**

7.      The Hypercaloric Diet, as defined by Therapeutic (Medical) Diets Policy I-1.1, is prescribed

for those patients with a chronic infectious disease that, due to the stresses of the disease, require

additional calories beyond those provided by the regular menu.  The Hypercaloric Diet provides

3,000 to 4,000 calories per day.  The Hypercaloric diet includes for breakfast, the regular meal, plus

a snack of a peanut butter and jelly sandwich (About 8 months ago it also included a carton of milk).

For lunch, the inmate receives the regular meal, plus a cheese sandwich snack (About 8 months ago

it also included a carton of milk).  For dinner, the inmate receives the regular meal with two snacks

(About 8 months there was no snack added). The Hypercaloric diet is sometimes referred to as

"Hypercaloric plus snacks", "Hypercaloric diet tray", "regular tray plus snacks", "Hypercaloric with

Snacks"or "Hypercaloric with A.M. and P.M. Snacks" by personnel in the prison food service

departments.  **Exhibit A; Exhibit B.**

8.      Food Service personnel at TDCJ's prison units are not authorized to prescribe, un-prescribe,

or modify any therapeutic diet.  **Exhibit A; Exhibit B; Exhibit C.**

9.      When therapeutic diets were first developed by Mr. Reddy in the mid 1990s, the Hypercaloric

diet consisted of a double portion at each meal, rather than the current meals plus snacks.  Based on

his experience, training, and information provided by clinicians on the units, Mr. Reddy determined

that inmates were generally unable to eat an entire double portion in one meal sitting, and therefore,

not consuming the therapeutic diet as prescribed by their doctors.  As a result, Mr. Reddy changed

the way the Hypercaloric diet was served, to its current meals plus snacks method.  Food service

personnel have been prohibited from giving double portions to inmates at meals since the change in

1999.  **Exhibit A.**

10.     There is no diet authorized by the Therapeutic Diet Manual which is described as a "5,000 Calorie Diet" or "5,000 Calorie Hypercaloric Diet". Although a free-world doctor or a prison unit medical doctor might prescribe a "5,000 Calorie Diet", no such diet plan exists in CMC. Because prison unit food service personnel are not authorized to create their own therapeutic diet menus, any prescription for a "5,000 Calorie Diet" or "5,000 Calorie Hypercaloric Diet" must be returned to the medical department, and re-prescribed as a diet recognized by TDCJ food service personnel. Generally, a high calorie diet such as a "5,000 Calorie Diet" or "5,000 Calorie Hypercaloric Diet" is re-prescribed as a Hypercaloric diet for purposes of TDCJ food service. This has been true since 1995. **Exhibit A; Exhibit B.**

11.     Patients who are medically prescribed calories in addition to the Hypercaloric diet must now get those prescriptions filled in the prison unit's medical department, rather than the unit's food service department. Those additional calorie prescriptions are generally provided in the form of one or more "Ensure" diet supplement drink. **Exhibit A; Exhibit B.**

12.     Since 2002, Captain Vincent Francis has been the Food Service Captain at the Connally Unit. He prepares the unit menus for inmates based on the menus provided to him by the Chief Dietician at CMC headquarters in Huntsville, Texas. His job duties include overseeing the preparation and serving of therapeutic diets in accordance with CMC's Therapeutic (Medical) Diets Policy I-1.1 and menus. **Exhibit B.**

13.     When a therapeutic diet is prescribed, the unit's medical department notifies (and has done so since 2002) Captain Francis either by e-mail or by the addition of the inmate's name and information about his diet to the therapeutic diet logs. Copies of samples of the logs are attached as Attachment 5 to Exhibit B. Upon receipt of the therapeutic diet log from the medical department,

Captain Francis reviews (and has done so since 2002) the logs and creates his own edited Diet Log for food service personnel which contains only the name and TDCJ-ID number of the inmate, and the type of the diet he is to receive.  Captain Francis does not give the therapeutic diet log from the medical department to Food Service personnel.  **Exhibit B.**

14.     Occasionally, Captain Francis has noticed that a CMC doctor has prescribed a diet which is different from those identified in the Therapeutic Diet Manual.  TDCJ policy does not permit Captain Francis nor his staff to create a menu which they believe will satisfy the doctor's prescription.  Instead, if the therapeutic diet log that is sent from the medical department to the Food Services department prescribes a diet different from those in the Therapeutic (Medical) Diets Policy I-1.1, Captain Francis has, since 2002, contacted the Unit's medical department and requested clarification or further instruction.  **Exhibit B.**

15.     If and when Captain Francis is notified that the inmate has been prescribed a therapeutic diet consistent with the Therapeutic (Medical) Diets Policy I-1.1, Captain Francis adds that inmate and his diet to Captain Francis' edited Diet Log that he prepares and posts for his staff.  If the medical department makes a change to the inmate's prescription, Captain Francis notes the changed prescription on his edited Diet Log.  **Exhibit B.**

16.     The unit Food Service personnel are not authorized to deviate from Captain Francis' edited Diet Log without his authorization.  In Captain Francis' absence, the therapeutic diet log received from the unit's medical department has sometimes not been re-created or re-typed as his edited Diet Log, and Food Service personnel might have seen the unit medical department's therapeutic log instead.  In the event a therapeutic diet issue arises in Captain Francis' absence, such as the

prescription of a diet not in the Therapeutic (Medical) Diets Policy I-1.1, the Food Service Manager is authorized to contact unit medical personnel for clarification or instruction. **Exhibit B.**

17.     Captain Francis is the custodian of the medical (or therapeutic) diet logs received in his office from the prison's medical department from June,1999 to the present. Captain Francis has reviewed those records and his summary indicates that the only reference to inmate Wanzer and 5,000 calorie diets appears on medical diet lists showing that a "Hypercaloric-5000 CAL" diet was prescribed for inmate Jerry Wanzer, TDCJ-ID #855976, with the date ordered as 10/16/01, the expiration date stated as 4/16/02, and the prescriber listed as "Cochran. **Exhibit B.**

18.     Defendant Tonia Black is currently employed by TDCJ as Food Service Manager III at the Connally Unit, a position she has held since at least 2001. She has worked for TDCJ, always at the Connally Unit, since 1995. She first worked as Operational Review Sergeant, a position that required her to know TDCJ's policies as they applied to all departments, including Food Service. **Exhibit C.**

19.     When Defendant Black worked for Food Service Captain Myers (the one preceding current Food Service Captain Francis), she was Captain Myers' assistant and reviewed his paperwork for him. She held this position because of her experience as Operational Review Sergeant. **Exhibit C.**

20.     As one of the Food Services Managers at Connally, Defendant Black's job duties have always been to supervise the inmates cooking the meals to feed 3,000 inmates; to ensure that the kitchen is cleaned after each meal; to ensure that the inmates and TDCJ employees in the kitchen adhere to TDCJ and UTMB policies; to ensure that meals are cooked as closely on time as possible; and to ensure that she follows the menus that Huntsville has provided to the kitchen. Defendant

Black worked continuously under the supervision of a Food Service Captain, except for a very brief time after Myers left when she was the acting Food Service Captain. **Exhibit C.**

21.     The chief dietician in Huntsville has always created a meal plan for both regular and medical diet trays for the entire year. The menu plan tells the Food Service workers what to feed the inmates every day, three times a day. Ever since Defendant Black has worked in Food Service, she and the others working there have always been required to follow the chief dietician's menu plans, except that the Food Service Captain has been permitted to make certain food substitutions. Any modifications had to comply with TDCJ and UTMB policies. **Exhibit C.**

22.     Ever since Defendant Black has worked in Food Services, the Unit's medical department has sent them regularly, at least monthly, a medical diet log informing them which inmates were to be provided the medical diets. **Exhibit C.**

23.     If a doctor prescribed a diet tray that was not contained in TDCJ and UTMB's policies, Defendant Black's practice was to speak to the Director of Nurses in the prison unit's medical department and do what that nurse instructed her to do. Defendant Black has never talked to any of the doctors about this because their contact for this issue has always been the Director of Nurses. This is how Defendant Black was trained by Captain Myers when she first came to work in the Food Service Department. **Exhibit C.**

24.     Defendant Black is not a doctor or nurse and has no medical training. **Exhibit C.**

25.     Since working as a Food Service Manager, Defendant Black can recall two times when she had to consult with the Director of Nurses about a prescription for a medical diet tray that she did not recognize as being included in TDCJ and UTMB policies. Both instances involved Jerry Wanzer

and prescriptions noted on the medical diet log for a 5,000 calorie diet, prescribed for the time period

between 10/16/01 and 4/16/02. **Exhibit C.**

26.    Defendant Black saw these prescribed diets on the diet log that the medical department

forwarded to the Food Service department, before the Captain of Food Services made his copies that

he distributed to all Food Service managers and employees. **Exhibit C.**

27.    On both instances regarding Jerry Wanzer and prescribed 5,000 calorie diets, Defendant

Black did not recognize a 5,000 calorie diet as one authorized by TDCJ and UTMB policies; it was

not included in the manual that Defendant Black referred to in the kitchen. **Exhibit C.**

28.    One of the instances occurred in 2001 when Captain Myers was in charge and the other

occurred after 2001.  On both instances, when Defendant Black noticed that the prescribed 5,000

calorie diet was not in her manual, she went to see the Director of Nurses in the medical department,

who said that she would take care of it.  The Director of Nurses told Defendant Black to continue

giving the diet that the nurse said was suppose to be given - - a hypercaloric diet with three snacks

a day (which is the same as TDCJ's hypercaloric diet).  In other words, the Director of Nurses told

Defendant Black on both occasions to give Jerry Wanzer the diet that was in the manual, not the diet

that was in the medical diet log. **Exhibit C.**

29.    After Defendant Black consulted with the Director of Nurses on the two occasions, the

prescription for the 5,000 calorie diet for Jerry Wanzer was eventually taken off the medical diet logs

that the medical department sent to the Food Service department. **Exhibit C.**

30.    There are two reasons why Defendant Black did not give Jerry Wanzer the prescribed 5,000

calorie diet.  First, she was not authorized to give him that diet tray because her manual of TDCJ and

UTMB policies did not have a 5,000 calorie diet included in the list of permitted medical diets and,

after consulting with the Director of Nurses, she was instructed on both occasions not to give Jerry Wanzer the 5,000 calorie diet. Second, Defendant Black has never seen a 5,000 calorie diet tray (nor has she ever provided one to an inmate) and would not know what foods would be authorized to be included on it. Defendant Black is not authorized to create such a new medical diet tray because it would be against TDCJ and UTMB policies. **Exhibit C.**

31.     In following the Director of Nurses' instructions on both occasions, Defendant Black acted as a reasonable public official, and a reasonable public official would not believe that Black's actions toward Wanzer were unconstitutional. **Exhibit C.**

32.     Jerry Wanzer complained to Defendant Black that he was suppose to have double portions of meat as part of his food tray. Defendant Black told him that according to the medical department, their policy did not have a 5,000 calorie diet in it. **Exhibit C.**

33.     In 2003, Jerry Wanzer came into the chow hall with a handwritten pass that stated he could have double portions of meat every day. Defendant Black took the pass because she was not sure if it was valid, as it was in the possession of an inmate rather than being forwarded to Food Services by the medical department. Defendant Black told Wanzer that she did not have authority to provide him what was stated on the pass and she told him she would check with the medical department after the meal. **Exhibit C.**

34.     After the meal, Defendant Black conferred with the Director of Nurses and showed her the pass. The Director of Nurses took the pass, said that it should not have been written, and said that she would take care of it. Later, the Director of Nurses called Defendant Black and told her that she had talked to the doctor and instructed her not to give Wanzer the double portions. **Exhibit C.**

35.     In following the Director of Nurses' instructions regarding the pass, Defendant Black acted

as any reasonable Food Service employee would act and a reasonable public official would not believe that Black's actions toward Wanzer were unconstitutional. **Exhibit C.**

36.     Defendant Black has heard Jerry Wanzer claim that he had problems with his thyroid. However, she never knew what he was talking about. She has no knowledge about whether he had any kind of serious medical need. She has never reviewed Wanzer's medical records or discussed his condition with his doctor. **Exhibit C.**

37.     It is Dr. Dan Kelley's expert opinion that a 5,000 calorie diet was medically unnecessary, that Plaintiff suffered no physical injury on the occasions when he did not receive the diet tray, and that the omission of the 5,000 calorie diet for Plaintiff for seven months (actually it was six months) did not affect Plaintiff's health. **Exhibit D.**

***Facts Regarding Plaintiff's Claim of Denial of Medical Care for Thyroid and Weight Loss***

38.     Plaintiff Jerry Wanzer received extensive and appropriate medical care between 2/16/99 and 3/05/02 as detailed in the Chronology of Relevant Medical Entries and expert Dr. Dan Kelley's affidavit. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

39.     Defendant Dr. Mercado only saw Plaintiff on five occasions:  September 2, 1999, December 3, 1999, May 30, 2000, July 6, 2000, and September 28, 2000. After September 28, 2000, Dr. Mercado was no longer Plaintiff's physician, as Dr. Mercado left the Connally Unit shortly thereafter. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

40.     Before this one year of treating Plaintiff, Dr. Mercado changed Plaintiff's diet on July 30, 1999 from a 5,000 calorie diet that was not recognized by TDCJ policy to the hypercaloric diet recognized by TDCJ policy (which provides 3,000 to 4,000 calories). It is Dr. Kelley's expert opinion that this was a correct medical decision because TDCJ's Food Service did not have a 5,000

calorie diet and such was medically unnecessary. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

41. It is Dr. Kelley's expert opinion that Plaintiff's low TSH blood level regarding his thyroid was resolving in June, 1999 and therefore, the nine pound weight loss was not unusual and not a cause for a physician to take any type of action. Further, the licensed dietician noted that Plaintiff was only one pound under his ideal weight and that TDCJ's hypercaloric diet was sufficient. By UTMB/TDCJ Correctional Managed Care's policy that was applicable to the prisons, Plaintiff did not even qualify for TDCJ's hypercaloric diet, as he was not under 10% of his ideal weight (i.e., he was not under 150 pounds) during any of the time period between February 16, 1999 and March 5, 2002. According to Dr. Kelley, patients who lose weight but are still above 10% of their ideal weight simply do not require any medical intervention when, as here, there is no sustained weight loss and there is no identifiable medical condition causing the weight loss or weight fluctuation. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

42.     Before seeing Plaintiff for the first time, Dr. Mercado appropriately ordered blood tests on July 7, 1999 for thyroid disease and all were normal. Dr. Mercado's physical examination of Plaintiff on September 2, 1999 revealed no signs of thyroid disease and Plaintiff's neck was normal. Plaintiff's weight was 161 pounds, only four pounds under his ideal weight, and thus not a cause for concern. It is Dr. Kelley's expert opinion that Dr. Mercado's assessment that Plaintiff's possible hyperthyroidism had resolved was correct. No other medical care was necessary. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

43.     It is Dr. Kelley's expert opinion that Dr. Mercado's discontinuance of Plaintiff's prescription

for Atenol was correct because Plaintiff's possible hyperthyroidism had resolved. When Dr. Mercado saw Plaintiff on December 3, 1999, Plaintiff had gained weight to 165 pounds and therefore, weight was not an issue. Blood tests for the thyroid were normal. Dr. Mercado's physical exam of Plaintiff revealed a questionable mass near the thyroid and therefore, Dr. Mercado appropriately referred Plaintiff to UTMB's John Sealy Hospital, the Endocrinology Clinic. No other medical care was necessary. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

44.     When Dr. Mercado saw Plaintiff on the next three visits - - May 30, 2000, July 6, 2000 and September 28, 2000 - - Plaintiff's weight fluctuated from 157.5 pounds to 155 pounds to 158 pounds. According to Dr. Kelley, this weight fluctuation is consistent with the Dysthemic Disorder that Plaintiff was diagnosed as having. Dysthemic disorders can adversely affect appetite and can be characterized by this type of weight fluctuation. Moreover, as Plaintiff was clinically depressed, this type of weight fluctuation could be caused by Plaintiff voluntarily not eating enough food. It is Dr. Kelley's opinion that in any event, neither the weight fluctuations nor the three weight readings, all above 150 pounds, present any medical problem. Plaintiff suffered from no sustained weight loss and he exhibited no signs of malnutrition. Further, on these three medical visits, Plaintiff's blood tests for thyroid and physical examinations were all normal, with no signs of thyroid problems. No further medical care was necessary. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

45.     Plaintiff claims that he sent a request to Dr. Mercado on November 20, 2000, inquiring about whether he would receive treatment, but Dr. Mercado agreed with the Endocrinology Clinic at John Sealy Hospital not to do anything. The medical records do not reflect hat Plaintiff made the request or that Dr. Mercado gave such a response. Nevertheless, it is Dr. Kelley's opinion that if Dr.

Mercado had given such a response, it would have been a correct one. The Endocrinology specialists at John Sealy Hospital had examined Plaintiff on October 24, 2000 and had concluded that Plaintiff's physical examination and blood tests regarding his thyroid were normal. No additional medical care was necessary. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

46.     Dr. Mercado appropriately ordered blood tests, conducted physical examinations, placed Plaintiff on a TDCJ hypercaloric diet and twice referred Plaintiff to the Endocrinology Clinic at UTMB's John Sealy Hospital.  According to Dr. Kelley, Dr. Mercado's medical treatment of Plaintiff was appropriate, within the standard of care for physicians in Texas, and clearly did not constitute deliberate indifference.  No reasonable physician in Dr. Mercado's position would have concluded that Dr. Mercado's medical treatment of Plaintiff constituted deliberate indifference. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

47.     Physician's Assistant Felkins saw Plaintiff on two occasions only:  February 22, 2001 and March 5, 2001.  On the first visit, Plaintiff's weight was 161 pounds and on the second it was 156 pounds.  On August 1, 2001 - - about two weeks after Plaintiff's recorded weight was 163 pounds - - Plaintiff requested a special diet and Felkins responded that none was necessary.  **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

48.     It is Dr. Kelley's opinion that Plaintiff's mild weight fluctuation did not present a medical problem and Plaintiff's weight, still above 150 pounds,  did not require any medical treatment. Again, Plaintiff did not have any signs of malnutrition.  No special diet was necessary and Felkins appropriately did not order any. Felkins' decision not to order a special diet was consistent with the decision of Plaintiff's treating physician at the time, Dr. Vadas, who did not order a special diet when he examined Plaintiff on July 16, 2001. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

49.     It is Dr. Kelley's expert opinion that Physician Assistant Felkins' medical treatment of Plaintiff was appropriate, within the standard of care for physicians in Texas, and clearly did not constitute deliberate indifference.  No reasonable physician's assistant in Felkins' position would have concluded that Felkins' medical treatment of Plaintiff constituted deliberate indifference. **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

50.     Dr. Nusynowitz and Dr. McKinney, both experts, have expressed their opinions that during the time period in question, Plaintiff's thyroid was normal and did not present a medical problem. The UTMB medical records support their opinions.  **Exhibit F; Exhibit G; Exhibit I.**

51.     Dr. Kelley's expert opinion is that Plaintiff did not have a serious medical need at anytime during 2-16-99 to 3-5-02.  **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**

52.     Recently, an MRI of Plaintiff's abdomen and a CT examination  were done, indicating that Plaintiff has bilateral adrenal adenomas (usually benign tumors). However, the condition is not a serious medical need and Dr. Kelley has concluded that it is not related to Plaintiff's previous medical complaints (those that are the subject of this lawsuit).  **Exhibit D; Exhibit H.**

## IV.
## DISCUSSION AND ANALYSIS

### A.     SUMMARY JUDGMENT STANDARDS

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©).  The moving party bears the burden of initially pointing out to the Court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial. *Duckett v. City of Cedar Park, Tex.,* 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, to survive a properly supported motion for summary judgment,

a §1983 plaintiff must demonstrate, in light of "the substantive evidentiary standard of proof that would apply at the trial on the merits" that "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## B.      STANDARDS FOR EIGHTH AMENDMENT MEDICAL CLAIM

To establish an Eighth Amendment violation, a plaintiff must show deliberate indifference to serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton' infliction of pain . . . proscribed by the Eighth Amendment." *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)(quoting *Estelle,* 429 U.S. at 104). The facts underlying a claim of "deliberate indifference" must clearly evince the medical need in question and the alleged official dereliction. The legal conclusion of "deliberate indifference" must rest on facts clearly demonstrating "wanton" actions on the part of the defendants. *Id.* The Supreme Court has adopted subjective recklessness as the standard for establishing deliberate indifference in the context of a claim of inadequate medical care. In order to act with deliberate indifference, a prison official must know of and disregard an excessive risk to an inmate's health or safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" and then consciously disregard the risk. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Stewart v. Murphy,* 174 F.3d 530, 533-34 (5th Cir. 1999); *see e.g., Norton v. Dimazana,* 122 F.3d 286, 291-92 (holding an inmate's dissatisfaction with the medical treatment he receives does not mean that he suffered deliberate indifference); *Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir. 1991)(holding inmate's "disagreement with his medical treatment" not sufficient to show Eighth

Amendment violation); *Fielder v. Bosshard,* 590 F.2d 105, 107 (finding "[m]ere negligence, neglect or medical malpractice is insufficient" to show Eighth Amendment violation).

## C.   PLAINTIFF'S CLAIMS THAT PRE-DATE 2-28-00 ARE TIME-BARRED

The statute of limitations for Texas plaintiffs in civil rights lawsuits under §1983 is two years. *Burrell v. Newsome,* 883 F.2d 416 (5th Cir. 1988). All of Plaintiff's claims that pre-date February 28, 2000, the date he mailed the lawsuit for filing, are therefore time-barred.

## D.   THE FACTS IN THIS CASE SHOW NEITHER A SERIOUS MEDICAL NEED NOR ANY DELIBERATE INDIFFERENCE BY THESE DEFENDANTS

The first element of proof that Plaintiff must make is to show that during the time period he has alleged regarding these defendants - - February 16, 1999 (when he transferred to Connally Unit) to October 31, 2001 - - he had a serious medical need that was known by defendants. *See, Olabisiomotosho v. City of Houston,*185 F.3d 521 (5th Cir. 1999). Plaintiff is unable to make this showing. Defendant Black's affidavit establishes that she had no knowledge of the nature of Plaintiff's medical condition and that she had no access to Plaintiff's medical records and had not conversed with his doctors. **Exhibit C.** As shown above and in detail in the affidavit of expert Dr. Dan Kelley, M.D., attached as **Exhibit D,** Plaintiff did not have a medical problem with his thyroid. Dr. Kelley's opinions are supported by Endocrinologist specialists, Dr. Nusynowitz and Dr. McKinney. **Exhibits F, G, and H.** Further, Dr. Kelley explains in detail in his affidavit that for the time period, February 16, 1999 to March 5, 2002, Plaintiff did not have a serious medical need regarding any weight loss or weight fluctuation. **Exhibit D.** Plaintiff cannot produce evidence on this essential element of his deliberate indifference medical claim. Accordingly, these Defendants are entitled to summary judgment on this basis.

Defendants are also entitled to summary judgment because the evidence shows that Defendants were not deliberately indifferent, as a matter of law.  As to the medical diets issue, Plaintiff's claim is limited to his complaint that he did not receive a 5,000 calorie diet.  **Exhibit J.** It is undisputed that the TDCJ and UTMB policies applicable to the prisons contained no 5,000 calorie diets and that Food Service Managers and employees were not free to create one, even if prescribed by a doctor.  **Exhibits A, B, and C.**  During the relevant time period, the well-known practice of Food Service personnel when they saw a prescribed diet that was not contained in TDCJ and UTMB policies was to contact the Director of Nurses in the prison unit's medical department. **Exhibits A, B, and C.**  Defendant Black's affidavit indicates that on both occasions when she noticed a prescribed 5,000 calorie diet for Plaintiff on the medical diet logs, she consulted the Director of Nurses who told her each time to give Plaintiff the hypercaloric diet plus three snacks (which is the same as TDCJ's Hypercaloric diet).  The evidence shows that  Defendant Black was adhering to TDCJ and UTMB policy and was not deliberately indifferent toward Plaintiff.

As to the medical care issue, Dr. Kelley's affidavit establishes that no one was deliberately indifferent to the medical needs of Plaintiff during the relevant time period.  As shown above, Plaintiff received extensive and proper medical care for his complaints.  **Exhibit D and Attachment 7 to Exhibit D; Exhibit E.**  The medical records indicate that Defendant Dr. Mercado and PA Felkins appropriately ordered blood tests, examined Plaintiff, referred him to UTMB and monitored his weight. Plaintiff is unable to controvert the expert affidavit of Dr. Kelley, M.D., who concludes that Dr. Mercado and Physician's Assistant Felkins' medical treatment of Plaintiff was "appropriate, within the standard of care for physicians in Texas, and clearly did not constitute deliberate indifference. **Exhibit D.**"

E.   **PLAINTIFFS CLAIMS AGAINST R. McKINNEY, MENDOZA, PARKER AND GREEN ARE ALL BASED ON *RESPONDEAT SUPERIOR***

Plaintiff's complaint reflects that he seeks to hold these Defendants liable only on the basis of *respondeat superior.* It is undisputed that Defendants Oscar Mendoza and Robert Parker were Wardens at the Connally Unit and Steven Green was an investigator during the time in question and their job duties did not include providing medical care to inmates. Further, Defendant Rochelle McKinney worked for TDCJ as Patient Liaison and did not have duties of direct patient care. In any event, Dr. Kelley's expert opinion is that she was not deliberately indifferent to Plaintiff's medical needs. **Exhibit D.** Plaintiff is unable to show otherwise. Accordingly, Defendants R. McKinney, Mendoza, Parker and Green are entitled to summary judgment on these additional grounds.

F.   **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

In their answers, Defendants availed themselves of qualified immunity, which "shields public officials . . . from damage actions unless their conduct was unreasonable in light of clearly established law." *Anderson v. Creighton,* 483 U.S. 635 (1987). The well-settled test for qualified immunity examines (1) whether the plaintiff has alleged a violation of a clearly established constitutional right, and (2) whether the defendant's conduct was objectively unreasonable in light of the clearly established law at the time of the incident. *Hare v. Corinth,* 135 F.3d 320 (5th Cir. 1998). Here, as shown above, reasonable physicians and Food Service managers would not believe that Defendants were deliberately indifferent or that a serious medical need was involved. **(Exhibits A -K).** Accordingly, Defendants are entitled to summary judgment on this additional basis.

ACCORDINGLY, these Defendants respectfully pray that the Court grant their summary judgment motion and enter an order dismissing all claims against them with prejudice.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

EDWARD D. BURBACH
Deputy Attorney General for Litigation

DAVID A. TALBOT, JR.
Chief, Law Enforcement Defense Division


_Anthony G. Brocato, Jr._

ANTHONY G. BROCATO, JR.
Assistant Attorney General
Attorney-In-Charge
State Bar No. 03039001

P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 463-2080 / Fax (512) 495-9139

**ATTORNEYS FOR DEFENDANTS
MERCADO, FELKINS, BLACK, R. McKINNEY,
MENDOZA, PARKER AND GREEN**

## CERTIFICATE OF SERVICE

I, ANTHONY G. BROCATO, JR., Assistant Attorney General of Texas, do hereby certify that a true and correct copy of **Defendants Mercado, Felkins, Black, R. McKinney, Mendoza, Parker and Green's Motion for Summary Judgment With Brief in Support** has been served by placing same in the United States mail, postage prepaid, on this the 27th day of August, 2004, addressed to the following:

Ms .M. Elizabeth Nagy
Mr. Michael B. Goldberg
Cox & Smith, Inc.
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
**Counsel for Plaintiff**

**Via CM/RRR No. 7003 1680 0001 3543 7637**

ANTHONY G. BROCATO, JR.
Assistant Attorney General

Page 22

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

**Notice of Document/Attachment(s)/Pages  Not Imaged**

**See Case File to View/Copy**
**Document/Attachment(s)**

✓      Document and/or  attachments exceed 100 pages.

_____      Exhibits or attachments submitted in binders or spiral notebooks